554 A.2d 1238

**Kevin Walter WARFIELD**

v.

**STATE of Maryland.**

No. 92, Sept. Term, 1988.

Court of Appeals of Maryland.

March 29, 1989.

476

Julia Doyle Bernhardt, Asst. Public Defender and Alan H. Murrell, Public Defender, on brief, Baltimore, for petitioner.

Ann N. Bosse, Asst. Atty. Gen. and J. Joseph Curran, Jr., Atty. Gen., on brief, Baltimore, for respondent.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ., and CHARLES E. ORTH, Jr., Associate Judge (retired, specially assigned).

CHARLES E. ORTH, Jr., Judge, specially assigned.

## I

Doris Weller, 76 years of age, had lived in the same house in Westminster, Carroll County, Maryland, for 40 years. Since the death of her husband, an attorney, she lived alone, with only two small dogs for company. Her property was bounded by Willis Street, Centre Street, and Court Lane. Her dwelling was at the rear of the Willis Street side of the lot. A two-car garage, separate from the dwelling, was at the opposite side of the lot. It paralleled Court Lane and was set back a short distance from Centre Street. Automobile access to the garage was from Centre Street by way of a ramp leading to two doors which were operated by mechanical door openers. There was a small door at the rear of the side of the garage facing Willis Street. Its door was never locked but was self-closing by means of a spring device. There were sidewalks along Willis Street and Centre Street. Within the lot there was a walkway from Centre Street to the dwelling and from Willis Street to the dwelling. The latter walkway ran along the side of the dwelling, crossed the walkway from Centre Street, and continued to the small door in the side of the garage. *See* diagram appended hereto.

The inside of the garage was cluttered, hardly leaving room to squeeze in two cars. There were boxes piled along the wall of the garage adjacent to the side door. Amidst the boxes were two cans containing United States coins. They came from Mrs. Weller's brother, now deceased. From time to time he had tossed his loose change into the cans. When his health failed, he turned the cans over to Mrs. Weller. She put them in the trunk of her car. One can was about 10 inches high. The other was smaller, about the size of a one-pound coffee tin. The coins in the cans were described by Mrs. Weller as "[s]ilvers, halves, quarters, dimes, nickels and pennies." The cans had been in the trunk of the car for some eight years when Mrs. Weller decided to store them in the garage. She put them amidst the boxes by the side door. About 10 days later, she discovered that the small can and its contents were missing. She recounted the circumstances of their disappearance.

After a heavy snowfall, Mrs. Weller hired Kevin Walter Warfield to shovel the snow off the sidewalks and walkways. Warfield was not a stranger. He had worked for her on previous occasions. From her house she "watched every once in a while to see that he was catching everything...." The snow "was deep." At one point he "disappeared" for about a half an hour. She did not know where he went. She was not concerned because she was not paying him by the hour. He had shoveled the snow on Willis Street, "[h]alfways down Centre Street," and "the front walk to the front porch," when she looked out and saw him coming out of the side entrance door to the garage. She had not given him permission to enter the garage. She left the house and confronted him. She "asked him what he was doing in there." He replied: "[W]e'd have to get the garage doors open to shovel the snow." She explained: "There's a ... little ramp between the street and the garage. He said he had to ... have the garage doors open to shovel that snow...." She told him: "[Y]ou didn't need to go in the garage for that at all." He said: "Well, I got tired. I went in to rest." According to a police officer,

Warfield later said that he went in to clean his boots off. Mrs. Weller looked in the garage and noticed that the boxes stored therein were "dissembled" and that the smaller can of coins was missing. She discussed the missing can with Warfield. He "denied that he had anything to do with it. He kept denying that he had taken—had anything to do with the can." The discussion ended when Warfield remarked that there was a lot of snow to shovel and indicated that he should be paid more. Mrs. Weller agreed to give him an additional $5. He completed the job, and she paid him. She never saw the smaller can or the coins it contained again.

At the time Mrs. Weller confronted Warfield, he was not wearing his jacket, so she saw no "bulging pockets." She thought that the can was too big and heavy to be carried in a pocket in any event. She "knew" that "nobody else went in that garage" because "if anybody comes near that yard, [the dogs] bark their heads off...." She did not know where the dogs were while Warfield was shoveling snow, but she was "inclined to think they might've been up on the porch."

The value of the coins in the missing can was not clearly determined. Mrs. Weller admitted that she "truly did not know"—she had never counted them. After some urging and suggestion, she thought that the value "couldn't have been less than 50 [dollars] and I'm sure it was more than 50." According to a police officer, she had told him that the value of the coins in the missing can was $150.

It was also not certain just when Mrs. Weller had last seen the smaller can after she removed it from the trunk and placed it in the garage. She said that she had last seen the cans the evening of the day before the smaller can was missing. According to a police officer, she told him that she had seen the cans "earlier in the week." Warfield's sister testified that Mrs. Weller told her that she did not know when she last saw the coins. In any event, Mrs. Weller said that the last time she saw the cans, the garage was "undisturbed."

Mrs. Weller's view of the affair can be summed up by her response to the observation by defense counsel at the subsequent trial:

Now Mrs. Weller, isn't it a fact that you really don't know what coins you had ... you really don't know when they were missing or what was missing. All you know is that you saw [Warfield] come out of the garage. And, therefore, you surmised that he had taken your coins.

Mrs. Weller said: "Well they were there the night before and they weren't there after he came out of the garage."

Later, thinking the matter over, Mrs. Weller, "got scared." Her house was the only one on the block, her next door neighbors were away, and she thought that somebody should know about the incident. She "didn't know who to call" so she called City Hall. A police officer was sent to investigate.[1]

## II

The police investigation of the missing can of coins ended with the arrest of Warfield. He was charged in an information filed by the State's Attorney for Carroll County with storehouse breaking (Maryland Code (1957, 1987 Repl.Vol.), Art. 27, § 33) first count; misdemeanor theft (Art. 27, § 342), second count; and breaking and entering a storehouse (Art. 27, § 31B), third count. A jury found him guilty of each offense. He was sentenced to 10 years on the first count and to 18 months on the second count to run concurrently. The conviction on the third count was merged into the conviction on the first count.

Warfield asks us to review the sufficiency of the evidence to sustain the convictions. The Court of Special Appeals refused to do so. *Warfield v. State,* 76 Md.App. 141, 543 A.2d 885 (1988). It opined that Warfield failed to preserve the sufficiency issue for the court's review. *Id.* at 144–147,

---

1. We have gleaned the substantial part of what is recounted above from the testimony of Mrs. Weller adduced at the trial of Warfield in the Circuit Court for Carroll County.

543 A.2d 885.[2]  The intermediate appellate court affirmed the judgment as to count 1, but vacated the sentence on count 2.  It merged the conviction on count 2 into the conviction on count 1 pursuant to the teaching of *Young v. State,* 220 Md. 95, 100–101, 151 A.2d 140 (1959), *cert. denied,* 363 U.S. 853, 80 S.Ct. 1634, 4 L.Ed.2d 1735 (1960).

Warfield looked to us by way of certiorari, and we granted his petition.  He claims that the holding of the Court of Special Appeals that he had failed to preserve the issue of the sufficiency of the evidence was erroneous.  He declares that the evidence was insufficient and urges us to pass on it.

### III

■ Article 23 of the Maryland Declaration of Rights declares:

In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction.[3]

The constitutional authority to pass upon the sufficiency of the evidence is implemented by statute and rule.  Maryland Code, Art. 27, § 593, provides:

In the trial of all criminal cases, the jury shall be the judges of law, as well as of fact, except that at the conclusion of the evidence for the State a motion for judgment of acquittal on one or more counts, or on one or more degrees of an offense, may be made by an accused on the ground that the evidence is insufficient in law to justify his conviction as to any such count or degree.  If

---

2. The Court of Special Appeals volunteered that if it were to address the sufficiency issue, it "would have found that the evidence was sufficient to support Warfield's conviction for breaking and stealing under art. 27, § 33." *Warfield v. State,* 76 Md.App. 141, 149, 543 A.2d 885 (1988).

3. For the history of Article 23 of the Maryland Declaration of Rights, see *Brooks v. State,* 299 Md. 146, 149 n. 1, 472 A.2d 981 (1984).

the motion is denied, he may offer evidence on his own behalf without having reserved the right to do so, but by so doing, he withdraws his motion. The motion may be made at the close of all the evidence whether or not such motion was made at the conclusion of the evidence for the State. If the motion is denied the defendant may have a review of such ruling on appeal.

Maryland Rule 4–324(a) reads (emphasis added):

A defendant may move for judgment of acquittal on one or more counts, or on one or more degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. *The defendant shall state with particularity all reasons why the motion should be granted.* No objection to the motion for judgment of acquittal shall be necessary. A defendant does not waive the right to make the motion by introducing evidence during the presentation of the State's case.

The Rule further states in § (c):

A defendant who moves for judgment of acquittal at the close of evidence offered by the State may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made. In so doing, the defendant withdraws the motion.

The authority of an appellate court to pass on the sufficiency of the evidence to sustain a conviction in a criminal cause tried before a jury is dependent upon the denial of a motion for judgment of acquittal duly made by the defendant. *Ennis v. State,* 306 Md. 579, 583–587, 510 A.2d 573 (1986); *Tull v. State,* 230 Md. 152, 155–156, 186 A.2d 205 (1962); *Wersten v. State,* 228 Md. 226, 229, 179 A.2d 364 (1962); *Woodell v. State,* 223 Md. 89, 93, 162 A.2d 468 (1960). The reason the denial of the motion enables the appellate court to pass on the sufficiency of the evidence was explained in *Brooks v. State,* 299 Md. 146, 150, 472 A.2d 981 (1984) (citations omitted):

> In determining the disposition of a motion for judgment of acquittal ... the trial court is passing upon the sufficiency of the evidence to sustain a conviction.... If the trial judge finds any relevant evidence which is legally sufficient to sustain a conviction, he must deny the motion for judgment of acquittal and allow the evidence to go before the trier of fact. The defendant is entitled to have the denial reviewed on appeal.

Since the denial was predicated on the sufficiency of the evidence, the resolution of the propriety of the denial necessarily encompasses a review of the sufficiency of the evidence.[4]

At the conclusion of the evidence for the State, Warfield made a motion for judgment of acquittal. It was denied. He offered evidence on his own behalf. At the close of all the evidence, he renewed the motion and again it was denied. Nevertheless, the Court of Special Appeals refused to pass on the sufficiency of the evidence. *Warfield v. State*, 76 Md.App. at 147, 543 A.2d 885. The refusal was bottomed on the statement in Rule 4–324(a) that "[t]he defendant shall state with particularity all reasons why the motion should be granted." *Id.* The court relied primarily on our declaration in *State v. Lyles*, 308 Md. 129, 135, 517 A.2d 761 (1986), that this "language of the rule is mandatory."[5] The intermediate appellate court in the case before us thought that it was

---

**4.** Of course,

> [i]f the trial judge finds that there is no relevant evidence which is legally sufficient to sustain a conviction, he must grant the motion for judgment of acquittal. When the motion is duly granted, the defendant stands acquitted on the offense to which the motion is directed. The grant has the same force and effect as the return of a verdict of not guilty by the trier of fact, be it the court or a jury.

*Brooks v. State*, 299 Md. at 151, 472 A.2d 981.

**5.** In *State v. Lyles*, 308 Md. 129, 517 A.2d 761 (1986), the defendant presented the motion at the close of the State's case in chief and at the close of all the evidence. He failed each time to give any reasons. *Id.* at 135, 517 A.2d 761. A majority of the Court held: "Accordingly, no

clear that Warfield's initial motion for judgment of acquittal was sufficiently particularized to preserve the sufficiency of the evidence for [the court's] review.

*Warfield*, 76 Md.App. at 146, 543 A.2d 885. We agree. It also thought, however, that it was

> equally clear that, *standing alone*, Warfield's second motion for judgment of acquittal was insufficiently particularized.

*Id.* (emphasis added). We agree. The court said that it was in accord with the State's notion that "Warfield's initial Motion for Judgment of Acquittal was a legal nullity incapable of being renewed by Warfield's second motion for judgment of acquittal." *Id.* We disagree. The court observed that it did not read the cases, the rule, and the statute

> as requiring that [the court] hold that a motion, withdrawn by the application of the Rule, is a legal nullity and therefore not renewable....

*Id.* Nor do we so read them. But the court was nevertheless "convinced that that is the proper result." *Id.* We are not so convinced. It summed up its view:

> Once he produced evidence, Warfield's original motion was no longer in existence and was not renewable. A motion made at the end of the case must conform to the requirements of the Rule and *Lyles* [308 Md. 129, 517 A.2d 761] whether it be in the nature of an "original" motion or an attempted "renewal" of a previous motion. Warfield's second motion for judgment of acquittal, made at the close of the entire case, was not sufficiently particularized under *Brooks* [*v. State,* 68 Md.App. 604, 515 A.2d 225 (1986), *cert. denied,* 308 Md. 382, 519 A.2d

---

grounds for the motion having been given, the issue of the sufficiency of the evidence has not been preserved." *Id.* at 136, 517 A.2d 761.

1283 (1987)] and *Lyles, supra,* and, thereby failed to preserve the sufficiency issue for our review.

*Id.* at·147, 543 A.2d 885. We do not accept this view.

At the close of the evidence offered by the State, defense counsel "move[d] for Judgment of Acquittal." He stated the reasons for the motion:

> As to Count I, which is the storehouse breaking, first of all, there hasn't been any proof that Mrs. Weller's ownership—now, I admit, I've been looking at the pattern jury instructions and it's mentioned ownership. I don't think we know, at this stage, who owned those coins that are allegedly gone. And secondly, it's pure conjecture, at this point, if it goes to the jury, that this Defendant took those coins. Even if we took the evidence as presented most favorable to the State, as we must at this stage, and that would refer to all three Counts, actually. By her own testimony, she—all she knows is, she thinks she had the coins the night before and they were gone the next day and this Defendant was seen coming out of the garage.
>
> The Officer's testimony says she—quotes her as saying she had them earlier in the week. And a jury would have to speculate (inaudible) conjecture to find that this Defendant took them, since there's nothing else to tie him to this. No physical evidence at all. No sign that he had any coins in his pocket or hid them or anything else.

The reasons went, as they should, to the sufficiency of the evidence and called upon the trial judge to pass on it. The trial judge called on the State's Attorney. He responded at length, point by point, to the reasons advanced by defense counsel. Thereupon, the judge denied the motion. It is no doubt that there was complete compliance with the command of Rule 4–324(a) that "[t]he defendant shall state with particularity all reasons why the motion should be granted."

Warfield offered evidence on his own behalf. At the close of all the evidence, defense counsel said: "I would

renew—renew my Motion for Acquittal on all three Counts." The trial judge again denied the motion.

■ We are not of a mind with the Court of Special Appeals in its belief that the second motion for judgment of acquittal must stand alone. As we have seen there were no reasons expressly advanced at the time the second motion was made. But when we consider the purpose of the statute and the rule in the light of their context, *see* *Kaczorowski v. City of Baltimore*, 309 Md. 505, 516, 525 A.2d 628 (1987), we are satisfied that the command to particularize reasons has been met in the circumstances here. The general purpose of the statute and the rule is patent. It is to implement, by means of a motion for judgment of acquittal, the constitutional authority given an appellate court to pass on the sufficiency of the evidence. The specific purpose of the mandate of the rule to particularize the reasons for the motion is to enable the trial judge to be aware of the precise basis for the defendant's belief that the evidence is insufficient. Then the judge in determining the motion may fully appreciate the position of the defendant. All in all the command to particularize the reasons operates to the benefit of the defendant and also acts as an aid to the trial judge.

When a defendant offers evidence on his own behalf after his motion for acquittal is denied, the motion is withdrawn and not subject to review. But the reasons given for the motion are still within the ambit of the trial; they are not erased. To strike them from the record so as to preclude their consideration with respect to the second motion is against sound reason, common sense, and the legislative intent. We do not see the "great burden" which the Court of Special Appeals fears this view would impose on the trial judge. *Warfield*, 76 Md.App. at 147, 543 A.2d 885.

■ When a party makes anew a motion for judgment at the conclusion of all the evidence and states that the motion is based upon the same reasons given at the time the original motion was made, or when a party "renews" a

motion for judgment and thereby implicitly incorporates by reference the reasons previously given, the reasons supporting the motion are before the trial judge. If, for any reason, the judge desires that the reasons be restated, the judge may simply say so, and the moving party must then state the reasons with particularity. If the judge does not wish the reasons restated, he or she may proceed to decide the motion on the grounds previously advanced. Obviously, when the moving party wishes to advance new or different reasons at the time the second motion is made, that party may do so, but should be careful to state whether the reasons being advanced are in lieu of or in addition to the reasons previously given.

■ We caution, however, that it would be far better for the defendant to place on the record that his reasons are the same as previously stated, and set out such further reasons he may have, but we do not think the intent of the rule is that he must be denied a review of the evidence for failure to do so. There is a sharp distinction to be drawn between cases in which reasons have not been particularized on either motion, and cases in which adequate reasons were given to support the first motion but not expressly set out for the second motion. In short, the withdrawal of a motion by the offering of evidence by the defendant does not kill it. It may be resurrected by renewing it, and the renewal will usually incorporate the reasons previously given. Here, the evidence offered on behalf of Warfield did not render the reasons previously advanced inappropriate. They were sufficient "to allow the trial court the opportunity to consider fully the basis for the motion." *Warfield*, 76 Md.App. at 147, 543 A.2d 885.

The command that the defendant in a criminal cause state with particularity his reasons for a motion for judgment of acquittal first appeared in Rule 4–324 as adopted effective 1 July 1984. We have indicated that the command was added to make the criminal rule consistent with its civil counterpart, Rule 2–519(a), concerning a "Motion for Judgment," which contained identical language. *State v. Lyles*, 308 Md.

at 135–136, 517 A.2d 761. *See* Standing Committee on Rules of Practice and Procedure Rep. No. 87 (9 December 1983). The State refers to *Rockville Corp. v. Rogan,* 246 Md. 482, 229 A.2d 76 (1967). In that case Rockville tendered a motion for a directed verdict at the close of the plaintiff's case. Rockville set out the reasons for the motion with particularity. Upon denial of the motion Rockville offered evidence. At the conclusion of all the evidence, Rockville made a motion for a directed verdict without stating the grounds therefore. This Court ruled:

> The second motion was defective, and having failed *to properly renew the first motion* and the reasons therefor, [Rockville] can not now rely upon either on appeal.

*Id.* at 484, 229 A.2d 76 (emphasis added). The Court observed:

> Since (Rockville) offered evidence after making its motion for a directed verdict at the close of [Rogan's] testimony, but failed to properly renew the motion at the close of all the evidence ... the rulings on the motions ... became the law of the case....

*Id.* at 484–485, 229 A.2d 76. It held that the question of the denial of the motions were "not properly before this Court for decision." *Id.* at 485, 229 A.2d 76. It said: "There is nothing before this Court to review." *Id.* at 484, 229 A.2d 76. Thus, the Court recognized that the original motion could be "renewed." But insofar as the opinion indicates that the motion could be "properly renew[ed]" only by expressly repeating the reasons originally given, it is overruled. *Compare Aleshire v. State,* 225 Md. 355, 170 A.2d 758 (1961).

The Court of Special Appeals believed:

> The only way that the sufficiency issue can be properly before us in the case *sub judice* is if Warfield's earlier motion was capable of renewal and not a legal nullity, thus requiring a complete restatement of the motion and of the argument.

*Warfield,* 76 Md.App. at 146, 543 A.2d 885. We believe, as we have seen, that the earlier motion was "capable of renewal" and was not "a legal nullity" and thus did not require "a complete restatement of the motion and the argument." And the transcript of the trial plainly reflects that Warfield did "renew" his first motion in just that language.[6] It follows that the answer to the first question presented by the writ of certiorari:

> Whether the Court of Special Appeals erred in holding that a motion for judgment of acquittal, once withdrawn, is a "nullity" and cannot, therefore, be renewed, and that thus [Warfield] failed to preserve the issue of evidentiary sufficiency for appellate review?

is "Yes." We hold that the propriety of the denial of Warfield's motion for judgment of acquittal made at the close of all the evidence is properly before us for review. Therefore, it is our duty to review the sufficiency of the evidence. *Brooks v. State,* 299 Md. at 150 n. 3, 472 A.2d 981.

## IV

### (A)

We pointed out in *In re Petition for Writ of Prohibition,* 312 Md. 280, 310, 539 A.2d 664 (1988), that what a court does in regard to passing upon the sufficiency of the evidence to sustain a conviction is "strictly circumscribed." The court does not inquire into and measure the weight of the evidence to ascertain whether the State has proved its case beyond a reasonable doubt.

> Weight and credibility are not at issue. The evidence must be read from the viewpoint most favorable to the

---

6. A relevant definition of "renew" which appears in Webster's Third New International Dictionary of the English Language, Unabridged (1981) is "to go over again: make or do again: REPEAT ( [renew] a motion)." It also gives as a definition "restore to existence: REESTABLISH, RECREATE."

prosecution and if so read any rational fact-finder would find it sufficient, the motion must be denied.

*Id.* at 325, 539 A.2d 664. In other words, the evidence is sufficient if there is any relevant evidence, properly before the jury, legally sufficient to sustain a conviction. *See Brooks v. State,* 299 Md. at 150, 472 A.2d 981, and cases therein cited.

### (B)

■ Mindful of the strictures in the exercise of our function to pass on the sufficiency of the evidence to sustain a conviction, we turn first to the conviction of Warfield for theft. Maryland Code, Art. 27, § 342 declares, inter alia:

(a) *Obtaining or exercising unauthorized control.*—A person commits the offense of theft when he willfully or knowingly obtains control which is unauthorized or exerts control which is unauthorized over property of the owner, and

(1) Has the purpose of depriving the owner of the property....

If the property has a value of less than $300, the crime is a misdemeanor. Subsection (f)(2).

We think that the evidence was not sufficient for a rational fact-finder to find beyond a reasonable doubt that Warfield stole the can of coins. It is true that Warfield was at the scene of the crime, but that alone is not enough. We said in *Johnson v. State,* 227 Md. 159, 175 A.2d 580 (1961):

Everyone accused of crime is presumed to be innocent; and, in order to justify a finding of guilt, it is incumbent upon the State affirmatively to establish the defendant's guilt beyond a reasonable doubt. We have held that the presence of the accused at the scene of the crime is an important element that may be considered in determining the guilt or innocence of a person charged with the crime, ... but presence, alone, at the place where a crime has been committed is not sufficient to establish participation in the perpetration of the crime.

*Id.* at 163, 175 A.2d 580 (citations omitted). It is also true that Warfield had the opportunity to steal the property, but others had the same opportunity between the time Mrs. Weller last saw the can and the arrival of Warfield on the scene. There was no evidence as to whether or not there were footprints in the snow leading to the side entrance to the garage before Warfield cleaned the walks. When Mrs. Weller saw Warfield leave the garage, the can was missing, but it did not appear to be in Warfield's possession, nor is there even conjecture about how he may have disposed of it had he in fact taken it at that time. Although Mrs. Weller checked on Warfield from time to time from her window, she did not see him enter or leave the garage prior to the time which led to the confrontation, and there is no evidence that he did so. Of course, he could have been in the garage during the period Mrs. Weller did not see him working, but she did not ask him where he was during that time, and the record does not reveal his whereabouts. The mere fact that Mrs. Weller did not see him for half an hour is not enough to support a conclusion that he spent that time in the garage stealing the can of coins. A rational inference may be made from the amount of snow shoveled at the time Mrs. Weller next saw him, that he spent at least a good part of the time during his "disappearance" shoveling snow out of the sight line of Mrs. Weller from her station at the window of the house. Although when confronted by Mrs. Weller and pressed to explain his presence in the garage, he offered two different explanations and later gave a police officer a third, the explanations were not that inconsistent and contradictory. He could have been in the garage for all three reasons. Each of the explanations was innocent in itself and could reasonably explain his presence. The only possible support for the notion that Warfield was the thief was his presence at the scene of the crime coupled with the fact that he gave more than one reason for being there. That Mrs. Weller did not hear the dogs bark while Warfield was working has little, if any, probative value. The evidence does not even disclose where they were.

We believe that the circumstantial evidence does not reach so far as to permit a rational fact-finder to conclude beyond a reasonable doubt that Warfield stole the coins. The trial judge erred in denying the motion for judgment of acquittal as to the charge of theft, and the Court of Special Appeals erred in affirming the conviction on the theft charge.

### (C)

The common law felony of burglary crossed the seas from England and became a part of the common law of Maryland.[7] The legislature provided a penalty upon conviction of burglary, Art. 27, § 29, and suggested a form of indictment for the crime, § 31, but did not attempt to define the offense. *McGraw v. State*, 234 Md. 273, 199 A.2d 229, *cert. denied*, 379 U.S. 862, 85 S.Ct. 124, 13 L.Ed.2d 64 (1964). In Maryland the common law offense retains its common law meaning—the breaking and entering of the dwelling house of another in the nighttime with an intent to commit a felony. *State v. Davis*, 310 Md. 611, 617, 530 A.2d 1223 (1987); *Sizemore v. State*, 10 Md.App. 682, 685, 272 A.2d 824, *cert. denied*, 261 Md. 728 (1971). The lacunas in common law burglary prompted the enactment from time to time of a hodgepodge of statutes. We now have in Maryland, in addition to common law burglary, crimes of statutory burglary and crimes of statutory breaking.

The breaking and entering of a dwelling house in the nighttime with the intent to steal the personal goods of another of any value is the statutory felony of burglary. Md.Code, Art. 27, § 30(a). It is also the statutory felony of burglary to break and enter, "either by day or by night, any building, whether inhabited or not," and open or attempt to open "any vault, safe or other secure place by the use of

---

7. "[T]he People of the State of Maryland ... declare: ... That the Inhabitants of Maryland are entitled to the Common Law of England...." Declaration of Rights, Art. 5.

nitroglycerine, gunpowder or other explosive...." Art. 27, § 34.

There is the statutory felony of breaking "a dwelling house in the daytime with intent to commit murder or felony therein, or with intent to steal, take or carry away the personal goods of another of any value therefrom...." Art. 27, § 30(b). There is also the statutory felony of breaking "a storehouse, filling station, garage, trailer, cabin, diner, warehouse or other outhouse or into a boat in the day or night with an intent to commit murder or felony therein, or with the intent to steal, take, or carry away the personal goods of another of the value of $300 or more...." Art. 27, § 32. There is also the statutory felony of breaking "into any shop, storeroom, filling station, garage, trailer, boat, cabin, diner, tobacco house or warehouse, although the same be not contiguous to or used with any mansion house, and stealing from thence any money, goods or chattels to the value of five dollars or upwards...." Art. 27, § 33.

There is the statutory misdemeanor of breaking "into any shop, storehouse, tobacco house, warehouse, or other building, although the same be not contiguous to or used with any mansion house, or into any boat, craft, or vessel, with intent to steal any money, goods or chattels under the value of $300," or stealing "any money, goods or chattels under the value of five dollars...." Art. 27, § 33A. The legislature also created the statutory misdemeanors of breaking and entering "the dwelling house of another," Art. 27, § 31A, and breaking and entering "a storehouse, shop, storeroom, filling station, garage, trailer, cabin, diner, boat, tobacco house, warehouse, or other outhouse of another in the day or night ...," Art. 27, § 31B.

## (D)

■ As we have seen, Warfield, in addition to being found guilty of theft, was also convicted of the crimes proscribed by § 33 and § 31B of Art. 27. Section 33 required not only a breaking of the garage but also the theft

therefrom of "any money, goods or chattels to the value of five dollars or upwards...." Theft is an essential element of that crime. Our conclusion that the evidence was not sufficient to sustain Warfield's conviction of stealing the can of coins leaves unproved the theft element required by § 33. Lacking proof that Warfield stole the property, the evidence is not sufficient to sustain the conviction and the conviction under § 33 falls. Therefore, the trial judge erred in denying the motion for judgment of acquittal as to statutory felony of breaking created by § 33, and the Court of Special Appeals erred in affirming the judgment entered by the trial court on that conviction.

### (E)

■ There remains for consideration the conviction of Warfield under Art. 27, §.31B. It is noted that common law burglary and the various statutory burglary and breaking offenses, except for those crimes created by §§ 31A and 31B, require a specific intent beyond the general intent to break a structure. This is so be they felonies or misdemeanors and whether they speak of a breaking and entering or merely a breaking. Sections 31A and 31B, however, do not have a specific intent as an element.

Article 27, § 31B was enacted by Acts 1979, ch. 598. The seed for it was planted, however, by the enactment of Acts 1973, ch. 661, codified as Art. 27, § 31A. In 1973 the Legislative Council of Maryland recommended the addition of a new § 31A to Art. 27, "creating the misdemeanor offense of breaking and entering the dwelling house of another." Report to the General Assembly of 1973 by the Legislative Council of Maryland at viii. The explanation given for the recommendation was:

> The Senate Judicial Proceedings Committee received testimony from the State's Attorney of various counties and Baltimore City that there is a need for a burglary offense of less severity than the present felony law, to facilitate the handling of cases in which the felonious intent of the intruder cannot be clearly shown. This bill

responds to this need by providing a misdemeanor offense for anyone who breaks and enters another person's home.

*Id.* at 122, item no. 187. *See also* 1973 Journal of Proceedings of the Senate of Maryland—Regular Session 136, 255, 274 (S.B. 218); 1973 Journal of Proceedings of the House of Delegates of Maryland—Regular Session 280, 2444, 2593. The Governor signed the enrolled bill into law. Acts 1973, ch. 661.

In *Bane v. State,* 73 Md.App. 135, 533 A.2d 309 (1987), the Court of Special Appeals discussed § 31A. It observed:

> The gravamen of the offense is the breaking and entering of the dwelling of another. To be convicted of statutory breaking and entering, as is evident from the legislative intent of the bill, no intent to commit a felony or to steal personal property need be shown.... The misdemeanor crime of statutory breaking and entering, therefore, is a nebulous one as it relates to the intent of the perpetrator, since no showing of any particular intent is required for a conviction under art. 27, § 31A. All that must be shown is that the perpetrator broke and entered a dwelling place of another.

*Id.* at 149–150, 533 A.2d 309. We observed in *Hawkins v. State,* 291 Md. 688, 694, 436 A.2d 900 (1981), that § 31A "necessitates no proof of a felonious intent." This is not to say, however, that a general intent is not necessary. Mens rea to break and enter must be established. There are "crimes which depend on no mental element, but consist only of forbidden acts or omissions. Where the legislature creates such an offense, criminal intent in any of its forms is not an element of the crime and need not be proved to justify a conviction...." 21 Am.Jur.2d *Criminal Law* § 138, at 270–271 (1981). The crime created by § 31A is not such a crime. It is not malum prohibitum but malum in se.[8]

---

**8.** Malum prohibitum is "[a] wrong prohibited; a thing which is wrong *because* prohibited; an act which is not inherently immoral, but becomes so because its commission is expressly forbidden by positive law; an act involving an illegality resulting from positive law. Con-

Where the statutory language does not clearly indicate whether intent is an element of the offense, the question is whether the legislature has made the act criminal without regard to criminal intent.

21 Am.Jur.2d *Criminal Law* § 139, at 273. A criminal intent requirement is usually implied in the case of a statutory offense which is malum in se. *Id.* at 274. The general rule is that when an act malum in se is made a crime by statute, the statute is to be construed in the light of the common law, and the existence of criminal intent is essential. 1 J. Bishop, *Bishop on Criminal Law* § 206a, at 136 (9th ed. 1923). The short of it is that, although § 31A does not call for a specific intent, it does require proof of a general intent to break and enter.

All that we have said about § 31A with respect to intent applies with equal force to § 31B. Section 31B was designed to fill the gap in § 31A by going beyond a dwelling house and including a bevy of structures and a boat. It was proposed in 1979 by H.B. 986 and assigned to the Judiciary Committee. Its progress through the legislative process to enactment was uneventful. Amendments from time to time did no more than add structures to be covered. An examination of the legislative bill file reveals what prompted the introduction of the bill. A handwritten note, undated and unidentified reads:

This bill makes it a crime to break into any of the listed structures. This fills a gap in the law created by the fact that Sec. 31A of the code makes it a crime to break into a

---

trasted with *malum in se.*" (Emphasis in original.) *Black's Law Dictionary* at 865 (5th ed. 1979).

Malum in se is "[a] wrong in itself; an act or case involving illegality from the very nature of the transaction upon principles of natural, moral, and public law.... An act is said to be *malum in se* when it is inherently evil, that is, immoral in its nature and injurious in its consequences, without any regard to the fact of its being noticed or punished by the law of the state." (Emphasis in original.) *Id.*

*See* W. Clark & W. Marshall, *Law of Crimes* §§ 5.00–5.03, at 232–243 and § 5.10, at 268–288 (6th ed. 1958) for a discussion of mens rea, crimes malum in se, and crimes malum prohibitum.

dwelling house—but the courts have said that an unoccupied beach cottage is not a dwelling house.

The other structures are covered in Sec. 32 but there must be an intent to commit a felony therein or steal the goods of another in [excess] of $100.

The similarity of the language of the two statutes and their legislative history [9] clearly show that § 31B, like § 31A, does not embrace a specific intent but does require a general criminal intent to break and enter.

Sections 31A and 31B of Article 27 create the misdemeanors of criminal trespass. Although not expressly so labeled and not included in the group of crimes under the subtitle "Trespass" in Article 27,[10] §§ 31A and 31B proscribe the intrusion upon the property of another with the general intent to break and enter but without the specific intent to commit a crime therein. This is the hallmark of a criminal trespass. *See* 3 C. Torcia, *Wharton's Criminal Law* § 343, at 245–246 (14th ed. 1980); 75 Am.Jur.2d, *Trespass* §§ 86–87, at 69–72 (1974); Model Penal Code § 221.2, at 144 (1985). It is the lack of the requirement of a specific intent that distinguishes §§ 31A and 31B from common law burglary and its offspring, the statutory burglary and statutory breaking and entering felonies and misdemeanors, in the Maryland law. Sections 31A and 31B clearly fall within the criminal trespass structures of other states, viewed schematically. *Wharton*, § 343, at 246–251.

The common requirement of criminal trespass offenses is that the actor be aware of the fact that he is making an unwarranted intrusion. The Model Penal Code reflects this

---

**9.** The meaning of the plainest language in a statute is controlled by the context in which it appears. *Kaczorowski v. City of Baltimore*, 309 Md. 505, 514, 525 A.2d 628 (1987).

**10.** Maryland Code (1957, 1987 Repl.Vol.), Art. 27, §§ 576–580 create a gaggle of criminal trespass misdemeanors ranging from trespassing on posted property, § 576, to trespassing in order to look into windows, § 580.

by making an intrusion culpable when a person knows that he is not licensed or privileged to enter. Section 221.2(1).

The knowledge requirement is designed primarily to exclude from criminal liability both the inadvertent trespasser and the trespasser who believes that he has received an express or implied permission to enter or remain.

2 Model Penal Code and Commentaries § 221.2, comment 2(a), at 88 (1980). The Model Penal Code provides that it is an affirmative defense to prosecution for criminal trespass if "the actor reasonably believed that the owner of the premises ... would have licensed him to enter...." Section 221.2(3)(c), at 144. The defense is available if the actor's belief is reasonable, that is, a belief which the actor is not reckless or negligent in holding. 2 Model Penal Code and Commentaries § 221.2, comment (2)(a), at 88. The comment notes that several states have adopted the Model Penal Code language to define the culpability for criminal trespass, several have adopted the affirmative defense provision, and most other states require some awareness of lack of authority, license, privilege, invitation, or legality. Very few states (the comment points to only two) seem not to require any awareness of lack of authority or privilege.

When a court is engaged in the devination of legislative "intent," the key is the purpose of the legislation, determined in the light of the statute's language and context. *Kaczorowski v. City of Baltimore*, 309 Md. 505, 516, 525 A.2d 628 (1987).

[W]e look at statutory language in context; we consider legislative history when it is available.... Our endeavor always is to construe a statute so as to implement the legislative goal, not to frustrate it.

*NCR Corp. v. Comptroller*, 313 Md. 118, 145–146, 544 A.2d 764 (1988).

When we pursue the context of statutory language, we are not limited to the words of the statute as they are printed in the Annotated Code. We may and often must

consider other "external manifestations" or "persuasive evidence."

*Kaczorowski*, 309 Md. at 514–515, 525 A.2d 628. Included among these other "external manifestations" or "persuasive evidence" are a bill's "relationship to earlier and subsequent legislation that fairly bears on the fundamental issue of legislative purpose or goal...." *Id.* at 515, 525 A.2d 628. This is the context in which we read the particular language of the statute. *Id.* " '[R]esults that are unreasonable, illogical or inconsistent with common sense should be avoided ... with the real legislative intention prevailing over the intention indicated by the literal meaning.' " *Kaczorowski* at 516, 525 A.2d 628, quoting *Potter v. Bethesda Fire Department*, 309 Md. 347, 353, 524 A.2d 61 (1987), quoting *State v. Fabritz*, 276 Md. 416, 421–422, 348 A.2d 275 (1975); *cert. denied*, 425 U.S. 942, 96 S.Ct. 1680, 48 L.Ed.2d 185 (1976).

■ The literal meaning of §§ 31A and 31B could indicate that the legislature intended to impose strict liability on a person who intrudes upon the property of another. But when we apply the precepts of statutory construction and examine the literal language of the statutes in the light of their legislative history, their affinity to common law burglary and the statutory burglary and statutory breaking and entering offenses, and their status as criminal trespass offenses, we are satisfied that the legislature intended that the intrusion, to be culpable, be with an awareness that it was unwarranted—lacking authority, license, privilege, invitation, or legality. To make culpable the inadvertent trespasser and the trespasser who entertains a reasonable belief that his conduct was proper would be unreasonable, illogical, inconsistent with common sense, and contrary to the interests of justice. Such results, we have stated, are to be avoided.

■ Warfield was not a trespasser as to Mrs. Weller's yard. He was lawfully on the property by invitation. He

had been hired to shovel the snow off the sidewalks and walkways, one of which led up to the garage door. He indicated a belief that it was necessary in the performance of his duties that he open the garage door and enter the garage to get at the snow piled against the door. This was not an unreasonable belief. Shoveling the snow from the door without opening the door and attacking the snow from the inside may well have scratched or damaged the door. Although he had not been given express permission by Mrs. Weller to enter the garage, neither had he been forbidden to enter it. It was not unreasonable for him to harbor the belief that Mrs. Weller would have empowered him to enter the garage to accomplish what she had employed him to do or to rest from his labors or even to knock the snow from his boots. Of course, she may not have given him permission to enter the garage because of the cans of coins she had stored therein. But there is no evidence that Warfield knew the coins were in the garage. The possibility that she may not have granted permission to enter would not affect a belief in the circumstances that she would have granted permission.

> What is absolute truth no man ordinarily knows. All act from what appears, not from what is.

*Bishop* § 303(2), at 204. The guilt of a person must depend on the circumstances as they appear to a reasonable man.

> [A]t common law an honest and reasonable belief in the existence of circumstances which, if true, would have made the act done innocent, is a good defense.

21 Am.Jur.2d *Criminal Law* § 141, at 276.

We conclude that, in the circumstances, the evidence here was not legally sufficient to convict Warfield of the criminal trespass proscribed by Article 27, § 31B as we have construed it. We hold that the trial judge erred in denying the motion for judgment of acquittal as to the charge under § 31B and that the Court of Special Appeals erred in

allowing the conviction on that charge to stand.[11]

## V

Warfield cannot be retried for any of the crimes of which he was convicted in light of our ruling that the judgment of acquittal should have been granted as to each of them. We pointed out in *In re Petition for Writ of Prohibition,* 312 Md. at 325, 539 A.2d 664, that the grant of a motion for judgment of acquittal results in acquittal because of the insufficiency of the evidence. *See also Brooks v. State,* 299 Md. at 151, 472 A.2d 981.

> When a criminal defendant takes an appeal and succeeds in having his conviction reversed *on a ground other than the sufficiency of the evidence,* the Fifth Amendment's Double Jeopardy Clause does not preclude a retrial of the defendant on the same charges.

*Huffington v. State,* 302 Md. 184, 189, 486 A.2d 200 (1985) (emphasis added; footnote omitted). In other words, the "Double Jeopardy Clause precludes retrial 'once the reviewing court has found the evidence legally insufficient' to support conviction." *Tibbs v. Florida,* 457 U.S. 31, 40–42, 102 S.Ct. 2211, 2217–2218, 72 L.Ed.2d 652 (1982), quoting *Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). *Accord Greene v. Massey,* 437 U.S. 19, 24–25, 98 S.Ct. 2151, 2154–2155, 57 L.Ed.2d 15 (1978); *Mackall v. State,* 283 Md. 100, 113–114, 387 A.2d 762 (1978).

JUDGMENTS OF THE COURT OF SPECIAL APPEALS REVERSED;

CASE REMANDED TO THAT COURT WITH DIRECTION TO REMAND THE CASE TO THE CIRCUIT COURT FOR CARROLL COUNTY WITH DIRECTION TO GRANT THE MOTION FOR JUDGMENT OF ACQUIT-

---

11. As we have noted *supra,* the trial judge did not impose a sentence on the conviction under § 31B, but merged it into the conviction under § 33. Thus, there was no judgment entered as to § 31B. The Court of Special Appeals did not address the matter.

TAL AS TO EACH OF THE COUNTS IN THE INFORMA-
TION;

COSTS IN THIS COURT AND IN THE COURT OF
SPECIAL APPEALS TO BE PAID BY CARROLL COUN-
TY.

McAULIFFE, J., dissented and filed an opinion in
which RODOWSKY, J., joined in part.

504

McAULIFFE, Judge, dissenting.

I agree that the issue of the legal sufficiency of the evidence is properly before us. I also agree with the interpretation that the Court has now given to the misdemeanor offenses of breaking and entering proscribed by Article 27, §§ 31A and 31B. I dissent only from the determination that the evidence was insufficient as a matter of law to support the convictions of theft and of breaking and entering.

## I.

### Breaking and Entering

As the majority points out, a person is not guilty of the misdemeanor offense of breaking and entering if he acted on the reasonable belief that he was authorized to break and enter. That belief must be 1) objectively reasonable and 2) actually held. This exposition of the law will come as no surprise to the attorneys who tried this case. Warfield's attorney argued to the jury that under the circumstances it was "perfectly reasonable" for Warfield to have gone into the garage in order to open the garage doors and thus facilitate the shoveling of snow. She told the jury that authority to enter the garage was "implied in doing the job." She said:

> [O]ur contention is that—that a person shoveling snow in the—around the garage had implied consent to go into the garage. Certainly, he was never told not to go into the garage, and it's perfectly reasonable to think that a person who's shoveling snow might very well go into the garage, and Larry Warfield[1] testified he did when he shoveled.

The prosecutor countered:

> Ms. Campbell asked you to believe that it was reasonable for the Defendant to go into the garage to shovel the

---

1. Larry Warfield is the defendant's brother. He testified that about one week after this incident he went to the complainant's home to

snow. The defense witnesses, particularly Larry War-field, would have you believe that it's reasonable for him to go into the garage when he shoveled snow. Mrs. Weller was adamant that there was no need to go into that. Of course, Mrs. Weller said she never had Larry Warfield shovel snow for her. The implication in the defense testimony is that, well, it's reasonable, other folks have done it, going into the garage; therefore, he had a right to go in there. No need to go into the garage, he could shovel from the outside, down the sidewalk, up to the garage doors on this apron to the garage door—doors themselves, no need to go in there to open those doors.

The defendant, as was his absolute right, did not testify. Why he went into the garage, and whether he held the honest belief that he was authorized to enter the garage through a closed door, had to be gleaned from the surrounding circumstances and from the three reasons he had given earlier for his entry. When the complainant saw the defendant exiting the garage, she immediately confronted him, demanding to know why he had entered. He said he had to open the garage doors to shovel the snow. As the following testimony of the complainant discloses, she pointed out to Warfield why that explanation would not hold water, and he changed his story:

And he said we'd have to get the garage doors open to shovel the snow. There's a—well, a little ramp between the street and the garage. He said he had to get the garage—have the garage doors open to shovel that snow and that wasn't so at all because the snow's out here and the doors are here. So, I told him that, I said, you didn't

shovel snow. He testified that although he knew his brother had just been arrested for going into the complainant's garage and stealing coins, he also went into the garage and opened a garage door to facilitate shoveling. The complainant denied that Larry Warfield had shoveled snow for her. The jury was free to reject Larry Warfield's testimony.

need to go in the garage for that at all. He said, well, I got tired. I went in to rest.

A third explanation for the defendant's entry was given to the police officer who arrested him on the following day. On that occasion, the defendant said he went into the garage to clean his boots.

Cross-examination of the complainant only served to reinforce her testimony that there was absolutely no need to enter the garage in order to shovel the snow.

**Defense Attorney:** So the person who was to shovel your snow needed to go in the garage to open up the door to be . . .

**Complainant:** You didn't have to have the door opened.

**Defense Attorney:** Are you saying that neither the— Kevin Warfield, or anyone else who shoveled for you before this episode, opened the garage door?

**Complainant:** They've never even been in the garage. There was no need to.

**Defense Attorney:** How do you know that?

**Complainant:** When your garage doors come down straight and the snow is here, you don't have to have those doors open to shovel the snow out here. Heavens.

I cannot square this testimony with the majority's conclusion that, as a matter of law, Warfield harbored a reasonable belief that "it was necessary in the performance of his duties that he open the garage door and enter the garage to get at the snow piled against the door." Majority opinion at [501].

Moreover, because the jurors could readily have found that Warfield lied about why he went into the garage, they were at liberty to infer a consciousness of guilt on his part.[2]

[C]hanges in defendant's explanation or conflicting admissions may support a finding of *scienter*, since while either of defendant's stories may be true, both cannot be and

---

2. The availability of this inference was not lost on the prosecutor, who forcefully argued this point to the jury.

the changes indicate an attempt to hide the guilty knowledge.

*Carter v. State,* 10 Md.App. 50, 55, 267 A.2d 743 (1970). The evidence was sufficient to support the conviction of unlawful breaking and entering.

## II.

## Theft

Much of what I have said concerning the sufficiency of the evidence to prove an unlawful breaking and entering applies with equal force to consideration of the theft charge. The inference of guilty knowledge, fairly drawn if the jury concluded the defendant had lied concerning his reason for entering the garage, applies here as well. The finding that Warfield had unlawfully broken and entered the garage is material to the question of whether he stole the coins.

The majority says that "[i]t was also not certain just when Mrs. Weller had last seen the smaller can after she removed it from the trunk and placed it in the garage." Majority opinion at [480]. I disagree. The complainant testified unequivocally that she had been in the garage the night before, and had observed that the coin can and the nearby boxes were "all lined up in order with the lids on and the cans where they belonged." The next morning, when she went outside to confront the defendant after seeing him emerge from the garage, she saw that the boxes were "dissembled," one of the cans of coins was gone, and a broom that had been standing in a corner was on the floor and broken.[3] The defendant offered testimony that the complainant expressed some uncertainty about when she had last seen the coins. The jury was under no obligation to accept that testimony, however, and would have been

---

**3.** The defendant admitted he had broken the broom. He told the complainant he did not know how that happened. The next day he told the police he had broken the broom when he went in the garage to clean his boots.

fully justified in finding that Mrs. Weller knew exactly when she had last seen the coins.

This is a circumstantial evidence case, and it is a close one. I am persuaded, however, that the testimony was legally sufficient to support the conviction of theft.

### III.

### Conclusion

The evidence was legally sufficient to support a finding that the defendant broke the storehouse and stole therefrom money of the value of $5.00 or upwards. The Court of Special Appeals held that the theft conviction merged into the conviction of storehousebreaking and stealing, and I agree. I would affirm the judgment of the Court of Special Appeals.

RODOWSKY, J., joins in Part I of this opinion.